FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 02, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:20-PO-08017-MKD-1 |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE CITATION |
| v. | |
| JAMES W BAUGH, | ECF No. 25 |
| Defendant. | |

Before the Court is Defendant James Baugh's Motion to Dismiss the Citation, ECF No. 25. The Court has heard from counsel, considered the parties' arguments, the briefing, the witness testimony, and the record, and is fully informed. For the reasons explained below, the Court denies the Motion.

## BACKGROUND

### A. Factual History

This case stems from a citation issued to Defendant on October 20, 2019, for felling a tree in the Okanogan-Wenatchee National Forest in violation of 36 C.F.R. § 261.10(l). ECF No. 1.

ORDER - 1

On October 18, 2019,[1] U.S. Forest Service Officer K. Mueller observed a man using a chainsaw to cut a standing tree in a prohibited area, near Forest Service Road 112 in the Okanogan-Wenatchee National Forest.  ECF No. 1-2. Officer Mueller attempted to contact him, but he did not respond and instead put away his chainsaw and drove away.  Officer Mueller took photographs of the man's vehicle as he drove away, and of the damaged tree.  She then contacted Officer T. Smith, who responded to the scene.  Officer Smith observed a recently cut fir tree and fresh sawdust on the ground.

Officer Mueller recounted her observations to Officer Smith and mentioned that she thought she recognized the man as "Jim Baugh."  Officer Smith checked the license plate of the man's vehicle and learned that it was registered to Defendant James Baugh.

Officer Smith contacted Defendant at his residence on October 20, 2019. Defendant told Officer Smith that he "was up in the hills" to cut firewood on October 18, 2019, and asked if Officer Smith had come "because the lady saw [him]."  Defendant said he had left because "the lady never got out of her truck."

---

[1] The citation lists the offense date as October 20, 2019, although it appears that was the date Officer Smith issued the citation.  *See* ECF No. 1.  The date of the underlying offense was October 18, 2019.  *See* ECF No. 1-2.

ORDER - 2

Defendant appeared to recognize Officer Smith.  While discussing where they could have met before, Defendant stated, "I have quite a history of dealing with cutting firewood."

Officer Smith asked Defendant if he had a permit for cutting firewood; Defendant said yes and produced it for inspection.  Defendant told Officer Smith that he didn't need to have a permit to cut firewood, as he is an enrolled Cherokee tribal member with treaty rights, but still obtains a permit because he doesn't "like to fight in court."  Defendant denied that Officer Mueller would have seen him cutting down a tree on October 18, 2019.  He said he had left Road 112 without any firewood to avoid conflict.

Officer Smith told Defendant he was not exempt from the permit requirement and had been cutting firewood in an area where it was prohibited. Officer Smith photographed Defendant's permit and tribal enrollment card and cited Defendant for 36 C.F.R. § 261.10(l) (violation of a term or condition of a special use authorization).  Defendant refused to sign the citation and declined Officer Smith's request to inspect the firewood near his home.

**B. Procedural History**

In March 2020, Defendant appeared on the citation and was appointed counsel.  ECF No. 9.  Defendant filed the instant Motion to Dismiss.  ECF No. 25. The Court heard argument on Defendant's Motion to Dismiss the Citation, ECF

No. 25.  Defendant was present and represented by AFDs Craig Webster and Paul Shelton.  Interns Abigail Maurer and Bailey Hampton represented the United States, under the supervision of AUSA Timothy Ohms.  Following argument, the Court ordered, and the parties filed, additional briefing on questions raised for the first time at the hearing.  ECF Nos. 37, 41, 49, 53, 54.

On July 9, 2021, the Court conducted an evidentiary hearing and heard further oral argument.  ECF No. 57.[2]  Defendant was present and represented by Mr. Webster and Mr. Shelton.  Interns Cassandra Hughes and Ms. Hampton represented the United States, under the supervision of AUSA Matthew Stone. Southern Cherokee Tribal Chief Stevie Matthews testified for Defendant.  *Id.*  The Court ordered a further round of optional, supplemental briefing on issues raised by Chief Matthews's testimony, the parties' arguments, and the Court at that hearing.  ECF No. 56.  Both parties submitted supplemental briefing.  ECF Nos. 58, 59.  The Court struck Exhibits B and C from Defendant's supplemental briefing, as the contents had not been identified or authenticated and were not matters of which the Court could take judicial notice.  ECF No. 60.  The Court permitted, and Defendant provided, revised briefing thereafter.  ECF No. 61.

---

[2] The Court cites to the hearing minutes when referring to the events of this hearing, as there is no formal transcript filed in the record.

ORDER - 4

# LEGAL STANDARD

## A. Motion to Dismiss

Under Federal Rule of Criminal Procedure 12(b)(1),[3] a party may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." "A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact." *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (citations omitted). The Court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Id.* (citation, quotation marks, and footnote omitted).

Whether a criminal charge is barred by a promise of immunity is a question of law that is properly brought in a pretrial motion. *See, e.g.*, *United States v. Bulger*, 928 F. Supp. 2d 305, 318-19 (D. Mass. 2013); *United States v. Dornau*, 356 F. Supp. 1091, 1099 (S.D.N.Y. 1973); *United States v. Rand*, 308 F. Supp. 1231, 1237 (N.D. Ohio 1970).

---

[3] The Federal Rules of Criminal Procedure apply to petty offenses unless Rule 58 provides otherwise. Fed. R. Crim. P. 58(a)(1).

ORDER - 5

**B. Treaty Interpretation**

When interpreting a treaty, a court must begin with its text. *Herrera v. Wyoming*, 587 U.S. 329, 349 (2019) (citing *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979)); *Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 206 (1999). "Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943). In other words, "courts cannot ignore plain language that, viewed in historical context . . . clearly runs counter to a tribe's later claims." *Or. Dep't of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985). But where the treaty text is ambiguous, ambiguities are to be resolved in favor of the Indian treaty party, and "the words of a treaty must be construed in the sense in which they would naturally be understood by the Indians." *Herrera*, 587 U.S. at 345 (citations and quotation marks omitted).

## DISCUSSION

**A. Summary of Parties' Arguments**

Defendant argues that, as an enrolled member of the Southern Cherokee Tribe, he is a beneficiary to the Treaty with the Cherokee (1835), 7 Stat. 478

(hereinafter "the Treaty of New Echota" or "Treaty")).[4]  ECF No. 25 at 2-3.  He

claims that the Treaty of New Echota[5] conferred rights that include a right to cut

firewood in the Okanogan-Wenatchee National Forest.  *Id.*

Defendant relies on the following Treaty language:

> In addition to the seven millions of acres of land thus
> provided for and bounded, the United States further
> guaranty to the Cherokee nation a perpetual outlet west,
> ***and a free and unmolested use of all the country west of***
> ***the western boundary of said seven millions of acres, as***
> ***far west as the sovereignty of the United States and their***
> ***right of soil extend*** . . .

*Id.* at 8 (emphasis in Defendant's brief).  He argues that the conduct underlying the

citation was "use" of land west of the Cherokee Territory and therefore protected

by the Treaty.  *Id.* at 2-3.

The Court construes this as a claim that the Treaty provision is the United

States' binding promise to members of the Cherokee Nation of immunity from

---

[4] Defendant filed a copy of the Treaty of New Echota at ECF No. 25-1.  For clarity, the Treaty citations in this Order refer to ECF No. 25-1.

[5] At the July 9, 2021, hearing, Chief Matthews also cited the Treaty of Nogales (between the Cherokee Nation and Spain, signed before the Louisiana Purchase) as a pertinent source of treaty rights.  However, the parties did not raise the Treaty of Nogales in the briefing, so the Court does not address it.

ORDER - 7

prosecution for such use, such that it is properly brought in a pretrial motion to dismiss.  *See Bulger*, 925 F. Supp. at 318-19.  Within this overarching claim of Treaty immunity, the parties dispute three key issues.[6]

First, Defendant argues that under the rules of construction that apply to Indian treaties, the scope of the Treaty right of "free and unmolested use" expanded with the westward expansion of the United States' sovereignty.  ECF No. 25 at 12-13; ECF No. 41 at 19-21; ECF No. 61 at 11-15.  The United States argues that the "use" clause applied to a finite parcel of land in Oklahoma (plus an approximately two-mile strip in Kansas), which did not include, and did not expand, to land in present day Washington state.  ECF No. 53 at 4-6; ECF No. 58 at 3-4.

Second, Defendant contends that Congress has not expressly abrogated the Treaty of New Echota nor the right of use.  ECF No. 25 at 10-12, 13-15; ECF

---

[6] Two previously disputed matters are now resolved.  The United States contended that the cited conduct occurred in Indian Country, but the parties now agree that it did not.  ECF No. 30 at 3-4; ECF No. 38 at 5.  Additionally, the United States no longer contests that the "free and unmolested use of all the country . . . ," as described in the Treaty of New Echota, would encompass the act of cutting a tree. ECF No. 53 at 4.

ORDER - 8

No. 54 at 11-14.  The United States responds that the Treaty right of use was abrogated by Congress when the Cherokee Nation conveyed the relevant land back to the United States.  ECF No. 53 at 6-7; ECF No. 58 at 5-7.

Third, Defendant argues that the Southern Cherokee descend from the signors of the Treaty of New Echota and are therefore successors-in-interest to the Treaty's benefits.  ECF No. 41 at 2-5, 28-29; ECF No. 54 at 1-11; ECF No. 61 at 15.  The United States asserts that Defendant is not a beneficiary of the Treaty of New Echota.  ECF No. 53 at 2-4; ECF No. 58 at 2-3.

Accordingly, to prevail on this Motion to Dismiss, Defendant must establish all of the following regarding the "use" clause at issue:

(1) that this language confers an easement right to take resources from land beyond the land conveyed to the Cherokees in fee simple by patent in 1838;

(2) that this easement right applies to any land west of the Cherokee Territory that the United States subsequently acquired after the Treaty was signed;

(3) that this easement right was not subsequently abrogated by Congress; and

(4) that the Southern Cherokee are beneficiaries of the Treaty.

ORDER - 9

The Motion fails on the first point.  Based on the Treaty language and the historical context of the Treaty, and Defendant's failure to produce evidence to the contrary, the Court concludes that the Treaty of New Echota did not confer a right to take resources from land beyond the land conveyed by patent to the Cherokees in fee simple in 1838.

**B. Historical Background**

"[R]eview of the history and the negotiations of the agreements is central to the interpretation of treaties."  *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 202 (citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999)).  This is "especially helpful" in the context of Indian treaties, which are interpreted "to give effect to the terms as the Indians themselves would have understood them."  *Id.* at 196 (citations omitted).

The Court begins by summarizing the history relevant to the instant motion.

*1.  The Treaty of New Echota*

The Treaty of New Echota was signed on December 29, 1835, with signatures and further signed articles added in 1836.  ECF No. 25-1; *Cherokee Nation v. United States*, 40 Ct. Cl. 252, 265-67 (1905).  The Senate ratified the Treaty and supplemental articles in May 1836.  *Cherokee Nation*, 40 Ct. Cl. at 268.

ORDER - 10

The "Cherokee Nation"[7] agreed to "cede, relinquish, and convey" seven million acres of ancestral land east of the Mississippi River to the United States. ECF No. 25-1 at 3, Art. 1. The United States promised various consideration, such as money, land, a future delegate in the House of Representatives, and subsistence resources. Article 2, the provision relevant to this Motion to Dismiss, contained certain promises relating to land. The first portion of Article 2 read as follows:

> ARTICLE 2. Whereas by *the treaty of May 6th 1828* and *the supplementary treaty thereto of Feb. 14th 1833* with the Cherokees west of the Mississippi *the United States guarantied and secured to be conveyed by patent, to the Cherokee nation of Indians the following tract of country*
>
> "Beginning at a point on the old western territorial line of Arkansas Territory being twenty-five miles north from the point where the territorial line crosses Arkansas river, . . . [8] will make *seven millions of acres within the whole described boundaries*. In addition to the seven millions of acres of land thus provided for and bounded, the United States further guaranty to the Cherokee nation a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend:

---

[7] As explained below, the precise identity of the Cherokee signatories of the Treaty is more complicated than the Treaty language reflects.

[8] The Court omits most of the detailed land boundary definition from the block quotation.

ORDER - 11

> *Provided however* That if the saline or salt plain on the western prairie shall fall within said limits prescribed for said outlet, the right is reserved to the United States to permit other tribes of red men to get salt on said plain in common with the Cherokees; And letters patent shall be issued by the United States as soon as practicable for the land hereby guarantied."

*id.* at 3-4, Art. 2 (emphases and paragraph break added). The opening clause explains that the quoted language sets forth the "tract of country" that "the United States guarantied and secured to be conveyed by patent" in its treaties "with the Cherokees west of the Mississippi" in 1828 and 1833. ECF No. 25-1 at 3.

The latter portion of Article 2 read as follows:

> And whereas it is apprehended by the Cherokees that ***in the above cession there is not contained a sufficient quantity of land for the accommodation of the whole nation*** on their removal west of the Mississippi the United States in consideration of the sum of five hundred thousand dollars therefore hereby covenant and agree to convey to the said Indians, and their descendants ***by patent, in fee simple*** the following ***additional tract of land*** situated between the west line of the State of Missouri and the Osage reservation beginning at the southeast corner of the same . . . ***estimated to contain eight hundred thousand acres of land***; but it is expressly understood that ***if any of the lands assigned the Quapaws shall fall within the aforesaid bounds*** the same shall be ***reserved and excepted out of the lands above granted*** and a pro rata reduction shall be made in the price to be allowed to the United States for the same by the Cherokees.

To summarize, Article 2 incorporated the United States' 1828 and 1833 treaty promises to "convey[] by patent" to the Cherokees a tract comprised of a

ORDER - 12

specifically defined 7-million-acre tract, "a perpetual outlet west, and a free and unmolested use . . . ," while reserving other Tribes' rights to collect salt from the salt plain if that salt plain happened to fall within the outlet, then promised to convey to the Cherokees by patent in fee simple an additional tract of land with specific boundaries, estimated to include about 800,000 acres, but minus any portion of that land that overlapped with lands the United States had previously assigned to the Quapaw Indians.

"The small number of Cherokees east of the Mississippi who negotiated" and signed the Treaty of New Echota were "called or styled the 'Treaty Party.'" *Cherokee Nation*, 40 Ct. Cl. at 265. Alternatively, the Treaty Party was called the "Ridge party, from the name of their leader."[9] *Western Cherokee Indians v. United States*, 27 Ct. Cl. 1, 3 (1891). The Treaty Party represented a "small minority" of the Eastern Cherokees who "were in favor of emigration" but had "no official position [or] any delegated authority" to act on behalf of the Eastern Cherokee Nation as a whole. *Id.*

---

[9] That leader was John Ridge, who was listed first among the "delegation . . . who represented that portion of the [Cherokee] nation in favor of emigration to the Cherokee Country west of the Mississippi" in the Treaty of New Echota. ECF No. 25-1 at 2.

ORDER - 13

1    In response to the signing of the Treaty, the Eastern Cherokee Nation

2    "immediately, by their proper and constituted authorities, disavowed the treaty as

3    the act of the Cherokee Nation," notified the President and Congress of their

4    position, "and at all times refused to recognize or yield any assent to its

5    requirements until compelled to do so" by military force in May 1838.[10]  *Id.*  The

6    Treaty Party "emigrated to the Cherokee country in the Indian territory" between

7    1836 and 1838.  *Id.*  At that time, the Treaty Party "number[ed] about 2,200"

8    individuals, while the rest of the Eastern Cherokee Nation "numbered about

9    14,757."  *Id.*

10    The Treaty Party was also distinct from the Western Cherokees, "who were

11    removed west of the Mississippi prior to May 23, 1836."  *Cherokee Nation*, 40 Ct.

12    Cl. at 265, 268.  The Western Cherokees were also known as the "Old Settlers,"

13    after the Eastern/Western terminology was "no longer distinctive."  *Id.*  The

14

15    [10] A group of "between eleven and twelve hundred" Eastern Cherokee were

16    permitted to remain in North Carolina, Tennessee, and Alabama under Article 12

17    of the Treaty of New Echota.  *Eastern Band of Cherokee Indians*, 117 U.S. at 303.

18    By remaining, the members of this group "ceased to be part of the Cherokee

19    nation, and henceforth they became citizens of and were subject to the laws of the

20    state in which they resided."  *Id.*

ORDER - 14

Western Cherokees had concluded their own treaties with the United States in 1817, 1819, 1828, and 1833. *Western Cherokee Indians*, 27 Ct. Cl. at 2-3; Treaty with the Western Cherokee (1833), 7 Stat. 414.[11]

The distinctions between the Treaty Party, Eastern Cherokee, and Western Cherokee are not expressly recognized in the text of the Treaty of New Echota and inconsistently recognized in other legal documents and decisions. *See* ECF No. 25-1 at 2 (bearing the official title of "Treaty with the Cherokee"); ECF No. 53-3 (describing the treaties of 1828, 1833, and 1835 as treaties "with the Cherokee Nation of Indians"); *Western Cherokee Indians*, 27 Ct. Cl. at 3 (describing the Treaty of New Echota as the "treaty between the United States and the Cherokee Nation, or Eastern Cherokees," while acknowledging that the Cherokee signatories were "[a] small minority of the [Eastern Cherokee] nation . . . known as the treaty party, or Ridge party"); *Holden v. Joy*, 84 U.S. 211, 213 (1872) (describing the Treaty of New Echota as "a treaty with the Cherokees") (emphasis

---

[11] Under these earlier treaties between the United States and the Western Cherokees, the Eastern Cherokees "acquired . . . no right or interest in the ceded lands in the Indian Territory, and asserted none." *Western Cherokee Indians*, 27 Ct. Cl. at 3. "This continued to be the condition of affairs" until the Treaty of New Echota. *Id.*

ORDER - 15

omitted); *Eastern Band of Cherokee Indians*, 117 U.S. at 293, 298-99 (noting that the Eastern-Western Cherokee divide was first recognized by the 1828 treaty with the Western Cherokee, and that the Treaty of New Echota was signed by "the Cherokee nation").  However, it appears well-accepted that these factional divisions existed, even if a particular faction was sometimes referred to as "the Cherokees" or "the Cherokee Nation" in general.

    2.  *Events from 1838 to 1846*

    As referenced in the Treaty of New Echota, the United States executed a patent on December 31, 1838, (hereinafter the "Patent" or "1838 Patent") conveying "two tracts of land" to "the Cherokee Nation of Indians" pursuant to the promises contained in the 1828 and 1833 treaties (with the Western Cherokee) and in the Treaty of New Echota.  ECF No. 53-3 at 2.  The Patent conveyed a total of 14,374,135.14 acres to the Cherokee Nation in fee simple, subject to the salt-plain easement secured by the Treaty of New Echota, as the salt plain "ha[d] been ascertained to be within the limits prescribed for the outlet," and certain rights reserved by the United States in Article 3 of the Treaty of New Echota.  *Id.*  The conveyance was made to the Cherokee Nation as a whole, including the Treaty Party, the Eastern Cherokee, and the Western Cherokee.  *Id.*; *see also E. or Emigrant Cherokees & W. or Old Settler Cherokees v. United States*, 88 Ct. Cl. 452, 465 (1939).

The forced removal of over 16,000 Eastern Cherokee to the Cherokee Territory—the Trail of Tears—began in May 1838 and concluded in March 1839. *Trail of Tears: History & Culture*, National Park Service (updated Apr. 23, 2025), https://www.nps.gov/trte/learn/historyculture/index.htm (last visited July 1, 2025). More than one thousand, and "perhaps several thousand," Eastern Cherokee did not survive the journey. *Id.*

Thereafter, the divisions between the three Cherokee factions remained deep. The Eastern Cherokee "treated the act of signing the treaties of 1835 and 1836 . . . as treasonable to the Cherokee Nation" and enacted and enforced "decrees of outlawry" against the Treaty Party. *Western Cherokee Indians*, 27 Ct. Cl. at 5. "They also maintained their authority throughout the Cherokee country by military force" against the Treaty Party "and all Western Cherokees who did not submit to and recognize their government." *Id.* The Eastern Cherokees "persecuted the Treaty Party Cherokees and the Western Cherokees[,] and a period of sanguinary strife, bordering on civil war, ensued." *Cherokee Nation of Indians in Okla. ex. rel. W. (Old Settler) Cherokee Indians v. United States*, 124 Ct. Cl. 315, 320 (1953). The Treaty Party and the Western Cherokee sided with each other but were still outnumbered by the Eastern Cherokee. *Eastern Band of Cherokee Indians*, 117 U.S. at 306.

ORDER - 17

On September 6, 1839, a "constitution for the reunited [Cherokee] nation" was adopted. *Heckman v. United States*, 224 U.S. 413, 431 (1912); *Eastern Band of Cherokee Indians*, 117 U.S. at 305. But the constitution's language of reunification did not end the "bitter feeling" between the factions. *Eastern Band of Cherokee Indians*, 117 U.S. at 305. "The situation became intolerable, and in 1845 the contending factions"—the Old Settlers, the Treaty Party, and the "[A]nti-[T]reaty [P]arty"— sent delegates to Washington" for recourse. *Id.* at 306. The Old Settlers and the Treaty Party sought "a division of the people into two nations and a division of the territory." *Id.* "Demands were also made by each party against the United States under the [T]reaty of New Echota." *Id.*

The result was the Treaty of August 6, 1846,[12] which was negotiated by delegates "appointed by the regular[l]y constituted authorities of the Cherokee nation," delegates representing the Treaty Party, and delegates representing the Old Settlers. *Id.* The 1846 treaty "declared that all difficulties and differences" between the factions "were settled and adjusted" and "that all party distinctions should cease" except as necessary to effectuate the treaty. *Id.* at 306-07. "The treaty also declared that the lands occupied by the Cherokee nation should be

---

[12] Treaty with the Cherokee (1846), 9 Stat. 871. This Order cites to this treaty through the copy provided by Defendant at ECF No. 41-2.

ORDER - 18

secured to the whole Cherokee people for their common use and benefit . . . thus

recognizing that all the lands ceded by the United States for the benefit of the

Cherokees west of the Mississippi belonged to the entire nation" rather than to any

individual faction. *Id.* at 307; ECF No. 41-2 at 2, Art. 1.

However, factional distinctions remained relevant for the purpose of

distributing the *per capita* payments promised in the Treaty of New Echota. *See*

ECF No. 41-2 at 2-3, Arts. 4-6. Article 6 specifically recognized that the Treaty

Party had "suffered losses and incurred expenses in consequence of" the Treaty of

New Echota and would receive specific indemnity payments therefor, including

payments to the heirs of Major Ridge, John Ridge, and Elias Boudinot. ECF

No. 41-2 at 3-4.

### 3. The 1866 Treaty

The Cherokee Nation was one of five Indian tribes that "fought with the

Confederacy during the Civil War" and, after the war, signed another treaty with

the United States. *See Harvest Inst. Freedman Fed. v. United States*, 80 Fed. Cl.

197, 198-99 (2008) (quoting Treaty with the Cherokee (1866), 14 Stat. 799), *aff'd,*

324 F. App'x 923 (Fed. Cir. 2009). In the 1866 treaty, the Cherokee Nation ceded

a portion of the lands they had previously acquired through the Treaty of New

Echota and authorized the United States to settle or purchase other lands for

resettlement of other Tribes. Treaty with the Cherokee (1866) at Art. 17, 14 Stat.

799; *see also* Charles C. Royce, *Map Showing the Territory Originally Assigned to the Cherokee "Nation of" Indians West of the Mississippi* (1884), N.Y. Public Library Digital Collections, https://digitalcollections.nypl.org/items/e14b40c0-de99-0135-1744-67aae6aad138 (last visited July 1, 2025) (regions 39 to 45 demarcate Cherokee lands affected by the 1866 treaty).

Article 4 provided that those Cherokees who "elect[ed] not to reside" between the Arkansas and Grand Rivers had "the right to settle in and occupy the Canadian district southwest of the Arkansas River, and also all that tract of country lying northwest of Grand River" and "bounded on the . . . west by the Creek reservation."[13]  Treaty with the Cherokee (1866) at Art. 4, 14 Stat. 799.  Article 8 described the occupants of these lands as "the so-called southern Cherokees."  *Id.* at Art. 8.

4.  *The "Cherokee Outlet" Agreement*

Finally, in 1891, the United States and the Cherokee Nation entered an agreement for the Cherokees' cession of "what was known as the Cherokee Outlet in Oklahoma."  *Cherokee Nation v. United States*, 270 U.S. 476, 480 (1926).  The

---

[13] This language parallels Chief Matthews's testimony that the Southern Cherokee were those living in the Canadian district or Cooweescoowee district of the Cherokee Territory.

ORDER - 20

Cherokee Outlet was comprised of "8,144,682.91 acres between the 96th and 100th degree of west longitude, south of the Kansas line." *Id.*

**C. Nature of the Treaty "Outlet" and "Use"**

Defendant argues that the Treaty language, "a free and unmolested use . . ." conferred to the Cherokees an easement right to use land "[i]n addition to and separate from" the 7-million-acre "main reservation land" and the "outlet to the west of the main tract." ECF No. 54 at 11-14; *see also* ECF No. 61 at 12-13. The United States argues that the outlet and the "free and unmolested use" provisions applied to the same "finite parcel" of land, which was conveyed in fee simple to the Cherokees in the 1838 Patent. ECF No. 53 at 4-5.

The Treaty does not define "outlet" or "use." Both words had numerous definitions in common use as of 1835. *See, e.g.*, *Outlet* at definitions 1.a, 1.b, 1.d, 1.3, 2, 3, 4.a, Oxford English Dictionary (https://www.oed.com/dictionary/outlet_n (last visited July 1, 2025). Therefore, the Court looks to the context surrounding the Treaty to determine the meaning of these words.

*1. Pre-1835 Contextual Sources*

The concept of an "outlet" for the Cherokees appears to date back at least as far as 1818, in statements from federal executive officials. In 1818, the Secretary of War wrote to the Superintendent of Indian Affairs that the Cherokee sought "an outlet to the West to the game country" and discussed whether the Osage Indians,

"who hold the country west of [the Cherokees'] Settlement," might relinquish some of that land "to give the outlet, or at least to grant [the Cherokees] an undisturbed passage to and from their hunting grounds."[14] *E. or Emigrant Cherokees*, 88 Ct. Cl. at 454. The same year, President Monroe also "expressed the desire to grant to [the Cherokees] an outlet west so as to provide additional hunting grounds[,] . . . in the nature of an inducement to [the Cherokees] for their removal from the east to the west of the Mississippi River." *Id.* at 463. These early references reflect some uncertainty about whether this "outlet" would take

---

[14] It was not uncommon for Indian treaties to reserve or confer rights for the Indian beneficiaries to travel or take resources from land outside the borders of the Tribe's own territory. *See United States v. Winans*, 198 U.S. 371, 381 (1905) (holding that an 1859 treaty with the Yakama Nation "imposed a servitude" upon the lands customarily used for fishing that guaranteed tribal members the right to pass through and fish on privately owned lands outside the reservation); *Antoine v. Washington*, 420 U.S. 194, 195-97 (1975) (reversing the convictions of two Colville tribal members for hunting deer out of season and outside the Colville reservation based on an 1891 treaty that expressly reserved hunting and fishing rights in that area).

ORDER - 22

1    the form of an additional portion of land granted to the Cherokees, or merely an

2    easement allowing "undisturbed passage to and from their hunting grounds."

3         The first Cherokee treaty to reference the outlet was the 1828 treaty between

4    the United States and the Western Cherokee.[15]  *Id.* at 463-64.  The preamble of the

5

6    _____

7    [15] The Cherokee signatories to the 1828 treaty and the subsequent 1833 treaty were

     the *Western* Cherokee, whereas the Treaty of New Echota was signed by the

8    Treaty Party from the Eastern Cherokee."  *E. or Emigrant Cherokees*, 88 Ct. Cl. at

9    464.  But these two prior treaties are closely interconnected with the Treaty of New

10   Echota.  The Treaty of New Echota expressly referenced the 1828 and 1833

11   treaties.  *See* ECF No. 25-1 at 3 ("ARTICLE 2.  Whereas by the treaty of May 6th

12   1828 and the supplementary treaty thereto of Feb. 14th 1833 with the Cherokees

13   west of the Mississippi . . .").  In fact, Article 2 of the Treaty of New Echota

14   quoted from the 1833 treaty, including the boundary definitions of the 7-million-

15   acre tract and the "outlet" and "use" language.  *See id.* at 3-4 (enclosing in

16   quotation marks the entire section from "Beginning with . . ." on page 3 to ". . . as

17   soon as practicable for the land hereby guarantied." on page 4).  The 1838 patent

18   expressly references the United States' commitments from these three treaties and

19   quotes from "the second and third articles of the treaty of the 29th of December,

20   1835[.]"  ECF No. 53-3 at 2.  Moreover, the Eastern Cherokee were formally

ORDER - 23

1828 treaty specifically cited "the pledges given [to the Western Cherokees] by the

President of the United States, and the Secretary of War" in 1818 and 1821 "in

regard to the outlet to the West[.]"  Treaty with the Western Cherokee (1828), 7

Stat. 311.  The 1828 treaty promised "seven millions of acres of land" to the

Western Cherokees and defined the borders of that tract in detail, then promised

the following, in more general geographic terms:

> . . . the United States further guarantee to the Cherokee
> Nation a perpetual outlet, West, and a free and unmolested
> use of all the Country lying West of the Western boundary
> of the above described limits, and as far West as the
> sovereignty of the United States, and their right of soil
> extend.

*Id.* at Art. 2.

The lack of any specified borders or acreage for the outlet demonstrated

continued uncertainty about whether the outlet would be a western addition to the

7-million-acre tract or an easement right to pass through Osage land.  But the

promise of a "free and unmolested use . . . ," which immediately followed the

promise of an "perpetual outlet west," clarified that the Cherokees would

nevertheless receive the right to use the land west of the promised 7-million-acre

tract all the way to the western boundary of U.S. territory.

---

recognized as parties to the 1828 and 1833 treaties in a later treaty.  *E. or Emigrant*

*Cherokees*, 88 Ct. Cl. at 464 (citing Treaty with the Cherokee (1846), 9 Stat. 871).

ORDER - 24

The 1833 treaty with the Western Cherokee revised the boundaries of the 7-million-acre tract set in the 1828 treaty. *See E. or Emigrant Cherokees*, 88 Ct. Cl. at 464; Treaty with the Western Cherokee (1833), 7 Stat. 414. As in the 1828 treaty, the 1833 treaty described the boundaries of the 7-million-acre tract in precise detail, then defined the "outlet" and the "use" in essentially identical, general terms:

> . . . the United States, further guarantee to the Cheerokee [sic] nation, a perpetual outlet west and a free and unmolested use of all the country lying west, of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend . . .

*Id.* at Art. 1. The 1833 treaty also added a caveat to the outlet:

> Provided however, that if the saline, or salt plain, on the great western prairie, shall fall within said limits prescribed for said outlet, the right is reserved to the United States to permit other tribes of red men, to get salt on said plain in common with the Cheerokees[.]

*Id.* This provision demonstrated continuing uncertainty about the ultimate location of the outlet—namely, that it was not yet known whether the outlet would encompass the "salt plain," which might complicate other Tribes' access to the salt resources there.

### 2. *Context from the Patent*

As previously noted, Article 2 of the Treaty of New Echota quoted the 1833 treaty's particularized definition of the 7-million-acre parcel of land and its less-

ORDER - 25

detailed promise of "a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend[.]"  ECF No. 25-1 at 3-4.  The Treaty described that quoted language as a definition of the tract of country the United States had "guarantied and secured to be conveyed by patent" to the Cherokees.  ECF No. 25-1 at 3-4.  This signaled that the "outlet" and "use" would be addressed in a forthcoming patent.

The 1838 Patent specifically referenced the United States' promises to "guarantee, secure and convey by patent . . . certain tracts of land" to the Cherokee Nation in the 1828 and 1833 treaties and the Treaty of New Echota, then quoted directly from Article 2 and Article 3 of the Treaty of New Echota.  ECF No. 53-3 at 2.  The section of the Patent labeled "Article 3" includes a recitation of Article 3 of the Treaty of New Echota, *plus* new language not found anywhere in the Treaty of New Echota.  That new language, hereinafter referred to as the "Patent Definition," provided:

> . . . And whereas, the United States have caused the said tract of seven million acres, together with said perpetual outlet, to be surveyed in one tract, the boundaries whereof are as follows: Beginning at a mound of rocks four feet square at base and four and a half feet high . . . containing within the survey ***thirteen millions, five hundred and seventy-four thousand, one hundred and thirty-five acres***

ORDER - 26

*and fourteen hundredths of an acre* [*13,574,135.14*[16]]. And whereas, the United States have also caused the said tract of eight hundred thousand acres to be surveyed, and have ascertained the boundaries thereof to be as follows:

Beginning at the southeast corner of Osage lands described by a rock, from which a red oak 20 inches diameter, bears south 27 degrees east 75 links, . . . containing *eight hundred thousand acres [800,000]*.

ECF No. 53-3 at 2 (emphases added).

In the next paragraph, the Patent declared the conveyance as:

THEREFORE, In execution of the agreements and stipulations contained in said several treaties, the United States have given and granted, and by these presents do give and grant unto the said Cherokee Nation, *the two tracts of land, so surveyed and hereinbefore described, containing in the whole [14,374,135.14 acres],* to have and to hold the same, together with all rights, privileges and appurtenances thereto belonging to the said CHEROKEE NATION, forever; subject, however, to the right of the United States to permit other tribes of red men to get salt on the salt plain, one [sic] the western prairie reserved to in the second article of the treaty of the 29th of December, 1835, which salt plain has been ascertained to be within the limits prescribed for the outlet agreed to be granted by said article; and subject also to all other rights reserved to the United States, in and by the article hereinbefore recited, to the extent and in the manner in which the said rights are reserved; and subject also to the conditions provided by the Act of Congress of the 28th of May, 1830, referred to in the above recited article; and condition is, that the lands hereby granted shall revert to

---

[16] This indicated that the outlet portion contained 6,574.135.14 acres, as the difference between the total tract acreage and the 7-million-acre portion.

ORDER - 27

the United States if the said Cherokee Nation becomes
extinct or abandons the same.

ECF No. 53-3 at 2.

The text of Articles 2 and 3 of the Treaty of New Echota specified two tracts
of land containing 7 million acres and an "estimated" 800,000 acres, respectively.
ECF No. 25-1 at 3-5.  In contrast, the Patent Definition specified two tracts of land
containing 13.574 million acres and 800,000 acres, respectively, or 14.374 million
acres in total.  ECF No. 53-3 at 2.  The acreage conveyed by the Patent "[i]n
execution of the agreements and stipulations contained in" the 1828 and 1833
treaties and the Treaty of New Echota matched the acreage in the latter two tracts.
*See id.*

Thus, the Patent Definition resolved the lingering uncertainty about the
nature and location of the outlet by defining one tract that combined the outlet and
the 7 million acres referenced in Article 2.  *Id.*  This combined tract extended
westward all the way to the territorial boundary with Mexico, northward all the
way to the boundary with Osage lands, and southward all the way to the boundary
with Creek lands:

> thence ***west on the southern boundary of Osage lands to
> the line dividing the territory of the United States from
> that of Mexico***, 288 miles 13 chains and 66 links, to a
> mound of earth, six feet square at base, and five and a half
> feet high, in which is deposited a cylinder of charcoal, 12
> inches long and 4 inches diameter; ***thence south along the
> line of the territory of the United States and of Mexico***,

ORDER - 28

> 60 miles and 12 chains, to a mound of earth six feet square at base and five and a half feet high, in which is deposited a cylinder of charcoal, 18 inches long and three inches diameter; ***thence east along the northern boundary of Creek lands*** 273 miles 55 chains and 66 links . . .

*Id.* By conveying title in fee simple to the Cherokees of all land west from the 7-million-acre parcel to the edge of the U.S.-Mexico territorial border, United States "guarantee[d], secure[d] and convey[ed] by patent" Article 2's "free and unmolested use of all the country west of the west boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend." ECF No. 53-3 at 2.

The Patent also resolved the other uncertainties in Article 2. The Patent confirmed that the salt plain referenced in Article 2 "ha[d] been ascertained to be within the limits prescribed for the outlet agreed to be granted by said article[,]" when reiterating the United States' reserved right to allow other Tribes to take salt from that salt plain. *Id.* The Patent also provided a more complex definition of the 800,000-acre tract, removed the conditional exclusion of any land that overlapped with Quapaw land, and confirmed that this tract contained 800,000 acres, where the Treaty had only "estimated" this tract to contain that acreage.

### 3. Summary of Contextual Analysis

The historical context surrounding the 1835 Treaty provides no support for the argument that the promised "use" extended past the geographic limits of the

ORDER - 29

land conveyed by the Patent or existed separate from the Cherokees' rights to "use" the land they owned in fee simple.[17]   The outlet, as defined in the Patent, covered all land west of the originally promised 7-million-acre tract.   There was no further western land within "the sovereignty of the United States and their right of soil," so there was no further right of use that could be conveyed.

### 4.  Defendant's Historical Evidence

Defendant has not provided evidence that supports a different conclusion. His strongest evidence was the testimony of Chief Matthews.  On the topic of the nature of the "use" promised in the Treaty, Chief Matthews testified that members of the Cherokee Nation were aware, at least as of 1849, that they needed "permission from the Indian agent" to go "east or south or north" of the Cherokee Territory, but not to go west to California or the Oregon Territory.  ECF No. 57. He stated that, during the 1849 California Gold Rush, members of the Cherokee Nation headed west in wagon trains that went "north, west, through Nebraska" under the belief that they did not need permission to do so.  *Id.*  Evidence of what

---

[17] As noted earlier, the Cherokee Nation ceded title to all land west of the 96th degree west longitude by the 1891 Cherokee Outlet Agreement, and thereby relinquished the right as titleholders to use that land.  This cession totaled 8.14 million acres, which encompassed the entire 6,574.135.14-acre outlet and more.

ORDER - 30

the Cherokees understood the Treaty to mean in 1849 is relevant to determining what the Cherokees understood it to mean 14 years earlier, in 1835.  But such evidence does not outweigh the above-described contextual evidence from treaties signed 7 years and 2 years prior to the Treaty of New Echota—one of which was expressly quoted in Article 2 of the Treaty of New Echota—and from the Patent executed three years after, and quoted in Articles 2 and 3 of, the Treaty of New Echota.  Additionally, this testimony is internally inconsistent—that is, that in 1849, the Cherokees believed they needed permission to travel north, but not north to the area of present-day Nebraska.

Defendant also submitted what appears to be a statement signed by several members of the Southern Cherokee tribe and dated Nov. 12, 2020.[18]  ECF No. 41-4.  One of the signatories appears to be Darla Matthews, who is identified in another exhibit as the Southern Cherokee Tribal Clerk.  *See* ECF No. 54-1 at 1.  However, whether the statement is the official position of the Tribe is not clear from its face—the other signatories' identities are not provided, and there is no signature from Chief Matthews, the only Tribal official that has been identified to the Court to date, although the document identifies him as Chief.  ECF No. 41-4 at

---

[18] In the associated brief, Defendant cites to this document as "Exhibit D" without stating what it is or authenticating it.  ECF No. 41 at 10, 19.

ORDER - 31

1    2.  The document states that the Southern Cherokee have interpreted Article 2 of

2    the Treaty of New Echota "to mean that [they] could hunt and fish and gather

3    anywhere west of the Mississippi."  ECF No. 41-4.

4        The Court has no reason to doubt that this is the belief of some Southern

5    Cherokee tribal members, and Defendant claims the same belief.  But the statement

6    has limited evidentiary weight where it has not been clearly identified or

7    authenticated.  Moreover, the belief that the Southern Cherokees' Treaty rights

8    extend "anywhere west of the Mississippi" cannot be reconciled with the Treaty

9    language.  Article 2 of the Treaty places the eastern boundary of Cherokee

10   Territory at the borderlines with "the old western territorial line of Arkansas

11   territory" and "the State of Missouri"; Missouri and the Arkansas Territory were

12   also west of the Mississippi River.  ECF No. 25-1 at 4, Art. 2; *see also* U.S.

13   Topographical Bureau, *Map Showing the Lands Assigned to Emigrant Indians*

14   *West of Arkansas and Missouri* (1836), Library of Congress,

15   https://lccn.loc.gov/99446197 (last visited July 1, 2025).  In other words, the

16   proposition claimed in ECF No. 41-4 would mean that the Treaty of New Echota

17   conferred the Cherokees rights in Missouri and Arkansas, which would contradict

18   the plain language of the Treaty it purports to interpret.[19]  Even if this document

19

20   [19] The Western Cherokee had once held land in the Arkansas Territory, but they

ORDER - 32

had been properly identified, it does not provide a credible interpretation of the Treaty.

Finally, Defendant has submitted what appears to be a summary of the Southern Cherokee Tribe's history, authored by Ms. Matthews in 2016. ECF Nos. 41-1, 54-1. This document is similarly unidentified and unauthenticated. But to the limited extent that the Court can consider it, it does not shed any light on how far the Treaty Party understood the right of use to extend. The section on the events surrounding the Treaty of New Echota focuses on the strife between the Treaty Party and the other Eastern Cherokee arising from the difficult decision whether to agree to a removal treaty. ECF No. 54-1 at 58-63. It briefly describes the Treaty terms as follows:

> The Treaty provided for exchanging the Eastern Cherokee's existing lands and resources in the east for the **_full legal title to lands and resources_** west of the Mississippi River. The treaties also provided the tribes with full governmental jurisdiction over all people and **_resources within their new tribal boundaries_**.

---

ceded this land in the 1828 treaty—seven years before the Treaty of New Echota. *See* Treaty with the Western Cherokee (1828), 7 Stat. 311; Royce, *supra* (the region in Arkansas ceded by the Western Cherokees in 1828 is the area labeled "37").

ORDER - 33

ECF No. 54-1 at 63 (emphases added). If the Court were to consider this as evidence of the Cherokee Nation's understanding of the Treaty terms, then it would seem to confirm that the Cherokees understood their Treaty rights to apply *only* to lands and resources within the boundaries of the Cherokee Territory.

Defendant has not produced appropriate evidence that persuades the Court that the Cherokees understood the "use" promised in Article 2 of the Treaty of New Echota to provide any right beyond what was conveyed to them by the 1838 Patent.

## CONCLUSION

The historical context surrounding the Treaty of New Echota, namely the 1828 and 1833 treaties and the 1838 Patent, demonstrate that the "use" promised in the Treaty did not confer any right to use land that extended beyond the boundaries of the land conveyed in the Patent, and, therefore, did not confer a right to "use" land and resources in present day Washington. Defendant has not submitted persuasive evidence to the contrary. Accordingly, Defendant's Motion to Dismiss is denied.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Defendant's Motion to Dismiss the Citation, **ECF No. 25**, is **DENIED.**

ORDER - 34

2.      **By no later than July 16, 2025,** the parties shall confer with each other and the Courtroom Deputy and file a joint proposed case management schedule for further proceedings in this matter.

**IT IS SO ORDERED**.  The District Court Executive is directed to file this Order and provide copies to counsel.

DATED July 2, 2025.

_s/Mary K. Dimke_
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

ORDER - 35